## In re CONSOLIDATED AUTOMATIC MERCHANDISING CORPORATION.

## UNITED STATES v. CONSOLIDATED AUTOMATIC MERCHANDISING CORPORATION.

### No. 423.

Circuit Court of Appeals, Second Circuit.

June 7, 1937.

Lamar Hardy, U. S. Atty., of New York City (James W. Morris, Asst. Atty. Gen., Sewall Key, Norman D. Keller, and Clarence E. Dawson, Sp. Assts. to the Atty. Gen., and Clarence W. Roberts, Asst. U. S. Atty., of New York City, of counsel), for the United States.

Smyth & Tuttle, of New York City (Nathan A. Smyth, of New York City, of counsel), for appellee.

Before MANTON, L. HAND, and AUGUSTUS N. HAND, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

The question raised by this appeal is whether certain shares of stock of the Consolidated Automatic Merchandising Corporation, the debtor in the above proceeding

for reorganization under section 77B of the Bankruptcy Act (11 U.S.C.A. § 207), were subject to documentary stamp taxes under section 800, Schedule A (3) of the Revenue Act of 1926, 44 Stat. 101 (see 26 U.S.C.A. § 900 and note), for the transfer thereof to voting trustees, and whether if such taxes were payable they were a liability of the debtor.

The Collector of Internal Revenue for the Third District of New York filed a claim for these taxes in the 77B proceeding, which was referred to Referee Irving Kurtz as special master. He reported that the shares were subject to documentary stamp taxes for transfer to the amount of $50,434.38 and that such sum, with statutory interest from February 4, 1932, to date of payment, should be allowed as a valid claim against the debtor. The correctness of the amount is not questioned, if any stamp taxes were due. The District Court denied the motion of the government to confirm the master's report and expunged the claim on the ground that, even if there were transfers of stock subject to tax, the debtor was not liable for the taxes. From the order expunging the claim the government has appealed. In our opinion the master reached a correct conclusion and the order of the District Court should be reversed and the report of the master confirmed.

The Consolidated Automatic Merchandising Corporation was organized under the laws of Delaware in 1928 and at once set about raising cash for corporate purposes and acquiring the stock of five companies in exchange for cash or for its own common and preferred stock. Its common stock was to be subject to a voting trust established between it, its stockholders, and the voting trustees. A resolution was adopted by the board of directors of the corporation that "all of the shares of Common Stock which are to be issued by the Corporation, be issued to and in the name of the Voting Trustees." The resolution further provided that the secretary and vice-president of the corporation were to give instructions to the voting trustees as to the persons to whom the voting trust certificates represented by the shares of common stock to be issued to the voting trustees were to be delivered. The voting trust agreement provided that:

"The Voting Trustees will from time to time, upon receipt of certificates from Common Stock in the Corporation * * * issue and deliver or cause to be delivered to the registered owner of such certificates or, in the case of certificates delivered by the Corporation, to such persons as the Corporation shall in writing * * * specify as the persons entitled to receive the same, Voting Trust Certificates * * * representing a like number of shares of such stock."

The voting trust certificates provided that the holders thereof by acceptance became bound by the terms of the voting trust agreement.

The voting trust certificates were issued in four ways: (1) To F. J. Lisman & Co. for cash; (2) to F. J. Lisman & Co. in exchange for preferred stock of certain of the five companies the stock of which it was the desire of the corporation to acquire; (3) to holders of common stocks of the five companies; (4) to holders of preferred stock of the corporation itself.

The debtor contends that the foregoing transactions involved only sales of trust certificates, and not transfers of stock of the corporation, for the reason that the shares were in every case issued directly to the voting trustees and never passed from those who acquired the voting trust certificates to the voting trustees. It is said that this must be so because the shares of common stock were issued to the latter before those who were to acquire the voting trust certificates had deposited cash or stock of the five companies in exchange for which the voting trust certificates were to be delivered and had thus furnished no consideration for the common stock of the corporation against which the voting trust certificates were issued. It is true that those who were to receive the trust certificates never obtained certificates for the common stock of the corporation and that after the stock was transferred to the voting trustees they had no more than an equitable title to the shares which would ripen into a legal title only when the voting trust agreement would terminate in 1938, but it was because of their right to or interest in the stock that it became vested in the voting trustees. The whole arrangement would have been abortive if the shareholders of the five companies and F. J. Lisman & Co. had not made their deposits with the trustees and by becoming parties to the voting trust agreement had not given their sanction to the transfer of the common stock of the corporation to the voting trustees. The acts of the shareholders and F. J. Lisman & Co. brought

600

about the issue of the common stock in the way adopted and indicate that the shares were first issued to the voting trustees instead of to those furnishing the consideration as a mere matter of convenience. As those persons ultimately were to have only an equitable title, this short cut was adopted, but it essentially involved two steps, the first being the acquisition of the stock and the next its immediate transfer to the voting trustees in return for voting trust certificates. The voting trustees were not intended to have any right to receive the certificates of stock in the beginning except as a preliminary to action of the stockholders of the five companies and F. J. Lisman & Co. in furnishing the consideration for the issue of the voting trust certificates. That we have correctly interpreted the intention of the parties and the effect of the voting trust agreement is evident from the fact that the "First" article of the agreement provides that:

"Each Stockholder subscribing to this Agreement hereby agrees to transfer to the Voting Trustees all the Common Stock in the Corporation to which he owns, or shall hereafter own, either the legal or equitable title in each case by delivering or causing to be delivered to the Voting Trustees the Certificates for said stock duly endorsed in blank or to the Voting Trustees, * * *

"Any owner of, or person entitled to the issue of shares of Common Stock in the Corporation, may become a party to this Agreement at any time by actual delivery to the Voting Trustees of certificates for the number of shares of such stock held by him properly stamped for transfer and duly endorsed in blank or to the Voting Trustees, * * * or by causing the Corporation to issue in the name of 'The Voting Trustees' under 'The Voting Trust Agreement dated May 29, 1928,' certificates for the number of shares of such stock to which such person may be entitled. * * *"

It is plain from the foregoing that the issue of the stock to the voting trustees was a mere alternative method for getting the certificates into their hands, which in theory involved a transfer of the certificate of each stockholder to them. That such was the nature of the transaction is evident from the fact that those persons to whom the trust certificates were issued are described by the parties to the "Trust Agreement" as "stockholders" and that it is provided therein that they shall deliver, or cause to be delivered, to the voting trustees their certificates of stock in the corporation.

If we are right in our analysis, the recent opinion by Justice Brandeis in Founders General Corporation v. Hoey, Collector, 300 U.S. 268, 57 S.Ct. 457, 81 L.Ed. ——, governs the situation. The only difference is that the stockholders here had certificates placed in the name of trustees under a voting trust agreement under which they obtained no immediate right to terminate the powers of the voting trustees and to reinvest the legal title to the shares in themselves, whereas in Founders General Corporation v. Hoey, Collector, supra, the shares, while not issued to the real owner, were by his direction issued to a nominee from whom he could obtain title at will. We think that the cases are essentially parallel. See Raybestos-Manhattan Co. v. United States, 296 U.S. 60, 56 S.Ct. 63, 80 L.Ed. 44, 102 A.L.R. 111 to the same effect.

The remaining question is whether the corporation that issued the stock direct to the voting trustees became liable under section 800, Schedule A (3) of the Revenue Act of 1926, for the payment of taxes upon transfers of stock by the recipients of the voting trust certificates. In Raybestos-Manhattan Co. v. United States, 296 U.S. 60, 61, 56 S.Ct. 63, 64, 80 L.Ed. 44, 102 A.L.R. 111, Justice Stone said that: "Section 800 imposes liability for the tax upon the transferor, the transferee and the corporation whose stock is transferred." It was thought by the District Court that this remark was a dictum and that the terms of the statute do not justify the imposition of a tax for the transfer of the shares on the corporation. Doubtless the remark was not necessary for the decision rendered in Raybestos-Manhattan Co. v. United States, supra, but we do not share the view that section 800 Schedule A (3) did not render the corporation liable for the tax.

We start with the fact that under Schedule A (3) of section 800 any person who in pursuance of a sale of stock "delivers any certificate or evidence of the sale of any stock, interest or right, * * * without having the proper stamps affixed thereto, with intent to evade" the provisions of the act, shall be deemed guilty of a misdemeanor and be subject to a fine or imprisonment. A corporation which makes such a transfer without seeing that proper stamps are affixed is likewise subject to civil liability for the amount of the tax. Section 800, Revenue Act 1926, 44 Stat. 99 (26 U.S.

C.A. § 900), provides that there shall be "levied, collected, and paid, for and in respect of the several * * * certificates of stock * * * and other documents, instruments, matters, and things mentioned and described in Schedule A of this title, or for or in respect of the vellum, parchment, or paper upon which such instruments, matters, or things, or any of them, are written or printed, by any person who makes, signs, issues * * * or for whose use or benefit the same are made, signed, issued * * * the several taxes specified in such schedule." The corporation under reorganization issued the stock and was a party to the voting trust agreement whereby upon joinder therein by the stockholders the transfers were effected. Schedule A (3) includes within the subjects of taxation transfers of legal title to shares or certificates of stock and rights to receive the same "whether made upon or shown by the books of the corporation, * * * or by any delivery, or by any paper or agreement or memorandum or other evidence of transfer or sale, whether entitling the holder in any manner to the benefit of such stock, interest, or rights, or not." The taxable transfers in the present case were effected by the voting trust agreement which was made and signed by the corporation, thereby bringing the transaction within the specific terms of the statute. Not only did the corporation issue the certificates of stock but the transfer was for its "use or benefit" because the object of the form which was given to the transaction was to enable the company through the voting trustees to have a consistent management and not to be subject to the possible varying desires of groups of independent stockholders.

The suggestion that the view we take might subject corporations to liability for failure to have stamps affixed to transfers which they know nothing about is of slight substance. It goes without saying that such transfers could not properly be said to be made by a corporation or for its "use or benefit." Here the corporation was a party to every detail of transactions necessarily involving the transfer to the voting trustees of the subscribers' rights to the shares. Under the agreement the corporation directed the voting trustees to deliver voting trust certificates to the persons entitled thereto. It thus made the transfers of the subscribers' rights effective and should be held liable for the tax.

In view of the findings of the special master, we hold that the debtor was informed by the internal revenue agent that the tax for the transfers was due from it and that accordingly the assessment was lawfully made.

The order of the District Court is reversed and the proceeding is remanded, with directions to enter an order confirming the report of the special master and allowing the claim of the United States for $50,434.38, with statutory interest to date of payment.