## UNITED STATES v. NIAGARA HUDSON POWER CORPORATION.

District Court, S. D. New York.

Jan. 5, 1944.

James B. M. McNally, U. S. Atty., of New York City (William L. Lynch and John B. Creegan, Asst. U. S. Attys., both of New York City, of counsel), for plaintiff.

LeBoeuf & Lamb, of New York City (Horace R. Lamb and John L. Grose, both of New York City, of counsel), for defendant.

GODDARD, District Judge.

The plaintiff, the United States of America, sues to recover from the defendant, Niagara Hudson Power Corporation (hereinafter referred to as Niagara Hudson) $4,915.50 alleged to be due as documentary stamp taxes in connection with the merger or consolidation of Northern Development Corporation (hereinafter referred to as Northern) and Oswego Corporation (hereinafter referred to as Oswego), two of the defendant's wholly-owned subsidiaries.

The action was begun by the filing of a complaint on November 30, 1942.

The facts, which have been admitted in the pleadings or contained in a stipulation, are as follows:

Niagara Hudson is a New York corporation, organized February, 1937 with an office and principal place of business in this district. It was the owner of all issued and outstanding capital stock (of no par value) of Northern and Oswego.

Northern is a New York corporation organized November 16, 1935 with an of-

fice and principal place of business in Syracuse, New York. Up to December 1, 1937 its issued and outstanding stock consisted of 120,000 shares. Oswego, also a New York corporation, was organized November 16, 1935 with its office and principal place of business in Syracuse; its issued and outstanding stock consisted of 37,500 shares. Some time previous to November 20, 1937 it was determined that the two corporations, Northern and Oswego, were no longer necessary, and it was decided to merge or consolidate them under Section 86 of the New York Stock Corporation Law, Consol.Laws N.Y. c. 59, Northern to be the continuing corporation. The Boards of Directors of these corporations and the defendant, as sole stockholder of the other two, took appropriate action to authorize the merger or consolidation. A plan of reorganization was prepared and approved by Northern and by Oswego on November 22, 1937. On November 23, 1937 the Niagara Hudson approved the plan. This plan provided that Oswego should be consolidated with and into Northern, which was to continue its existence. The issued and outstanding 120,000 shares of Northern stock, all owned by the defendant, were to be continued without any change in form. The 37,500 shares of Oswego were to be converted into the same number of shares of Northern stock and were, as such, to be held and owned by Niagara Hudson. It also provided that the Niagara Hudson would execute an appropriate Certificate of Consolidation. Up to then Northern was authorized to issue only 120,000 shares of stock so that it was necessary to provide for an increase in its authorized stock. This was accordingly done on November 30, 1937 with the filing in the office of the Secretary of State of New York, of a Certificate of Increase from 120,000 to 157,500 authorized shares of Northern.

On December 1, 1937 a Certificate of Consolidation was filed in the office of the Secretary of State of New York and the consolidation was completed. Under the terms of this certificate Oswego was consolidated into Northern and each share of Oswego's stock was converted into one share of stock of the consolidated corporation. The certificate also provided that upon the filing of the certificate the holders of Oswego's stock became holders of the stock of the consolidated corpora-

tion, share for share. Oswego ceased existing after December 1, 1937 and the Niagara Hudson then owned all of the 157,500 shares of Northern. All the property formerly owned by Oswego became the property of Northern. This property included real estate, and buildings, valued at $3,415,337.39. The only documentary stamp taxes that have been paid by any of the parties concerned in the reorganization was the original issue tax on the issuance of the additional 37,500 shares of Northern stock.

The Government contends that two additional stamp taxes are due; that since the new 37,500 shares of stock were issued directly to Niagara Hudson rather than being issued first to Oswego and then transferred to Niagara Hudson, that a documentary stamp tax had been incurred on the transfer from Oswego to Niagara Hudson of the right to receive such shares; that under the statute in effect in 1937 the computation of this tax would be as follows:

37,500 shares common no par value
stock at 4¢ per share..... $1500

It also claims that the transfer of realty was subject to documentary stamp taxes computed at the rates in effect in 1937. This tax would be as follows:

$3,415,337.39 at 50¢ for each $500—$3,415.50

The answer of Niagara Hudson denies liability for documentary stamp taxes and alleges that the complaint does not state a claim upon which relief can be granted; also pleads the statute of limitations as a complete bar, and further contends that there is a defect as to parties defendants that if there is any liability as to realty taxes it was incurred by Northern, which is not a party to this action. The case presents four questions:

1. Whether there is due a documentary stamp tax on the transfer from Oswego to Niagara Hudson of the right to receive the 37,500 shares of Northern?

2. Whether there is due a documentary stamp tax on the transfer of realty from Oswego to Northern?

3. Whether, if these taxes are due, is the Niagara Hudson liable for either or both of these taxes?

4. Is the action barred by the statute of limitations?

■ It is advisable, first, to dispose of the question of the statute of limitations

because if the statute has run, it would be unnecessary to consider the other issues.

Section 3312 of the Internal Revenue Code, 26 U.S.C.A. Int.Rev.Code, § 3312, bars an action for the collection of all taxes except income, estate and gift taxes which have not been assessed, unless such action be commenced before the expiration of five years after such taxes become due. No assessment was made of the tax now in question, so this suit is timely only if commenced within five years after the liability arose. Defendant contends that the Statute of Limitations began to run either on November 23, 1937—the date of the approval of the plan of reorganization —or, on November 26, 1937—the date of the execution of the Certificate of Consolidation. The consolidation was merged or consolidated under the New York State Corporation Law. Section 89 [1] of that Act says it is the filing of the Certificate of Consolidation which effects the transfer. Hence it seems clear that it is not the date of the execution of the certificate or the approval of the general plan of reorganization but the date when the certificate is filed which is to be accepted as the date when the transfer takes place.

The Certificate of Consolidation was filed on December 1, 1937, and it is this certificate which effected the transfers and is the document which, if stamps were required, should bear the necessary tax stamps. The action for the collection of taxes was commenced on November 30, 1942, which is within the five years' limitation and therefore timely.

Next, is the question of whether the transfer from Oswego to Niagara Hudson of the right to receive the new 37,500 shares of Northern, which were issued directly to Niagara Hudson is a taxable transfer under Schedule A(3) of the Revenue Act of 1926, as amended by Revenue Act 1932, § 723(a).[2]

By the consolidation, substantial assets previously owned by Oswego became the property of Northern. Prior to this, all of Oswego's 37,500 shares of stock were owned by Niagara Hudson, as well as all of Northern's 120,000 shares of stock. Upon merger Northern increased its stock to 157,500 shares. With the completion of the consolidation Oswego passed out of existence and its 37,500 shares were converted into the additional shares of Northern. The new shares of Northern became the property of Niagara Hudson, although without going through the procedure of being first issued to Northern and then transferred to Niagara Hudson. Normally the 37,500 shares would have been issued to Oswego, which would have distributed it to its stockholders and the stockholders could have held or sold it as they saw fit, but a short cut was adopted and it was issued directly by Northern to Niagara Hudson. The generating source of the right to receive the newly issued shares of Northern was the conveyance to it by Oswego of all of Oswego's assets.

---

[1] "Sec. 89. Transfer of properties of constituent corporations to corporation formed by consolidation.

"Upon the filing of such certificate of consolidation in the office of the secretary of state all the rights, privileges, franchises and interests of each of the constituent corporations, and all the property, real, personal and mixed, and all the debts on whatever account to any of them, as well as all stock subscriptions and other things in action belonging to any of them, shall be taken and deemed to be transferred to and vested in such consolidated corporation * * *." (as amended L.1937, c. 359, § 4.)

[2] "Schedule A.—Stamp Taxes * * *

"3. Capital stock [and similar interests], sales or transfers: On all sales, or agreements to sell, or memoranda of sales or deliveries of, or transfers of legal title to any of the shares or certificates mentioned or described in subdivision 2, or to rights to subscribe for or to receive such shares or certificates, whether made upon or shown by the books of the corporation or other organization, or by any assignment in blank, or by any delivery, or by any paper or agreement or memorandum or other evidence of transfer or sale [whether entitling the holder in any manner to the benefit of such share, certificate, interest, or rights, or not], on each $100 of par or face value or fraction thereof of the certificates of such corporation or other organization [or of the shares where no certificates were issued] 4 cents, and where such shares or certificates are without par or face value, the tax shall be 4 cents on the transfer or sale or agreement to sell on each share [corporation share, or investment trust or other organization share, as the case may be] * * *." 26 U.S.C.A. Int. Rev.Acts, page 290. [The rate has varied, but in 1937 it was 4 cents].

Oswego in consideration for transferring its assets to Northern received the right to the 37,500 shares of stock which Northern issued. Under the plan of consolidation Oswego transferred the right to the 37,500 shares to Niagara Hudson.

In Raybestos-Manhattan, Inc., v. United States, 296 U.S. 60, 56 S.Ct. 63, 80 L.Ed. 44, 102 A.L.R. 111, when pursuant to a consolidation agreement two corporations conveyed their property to a new corporation in return for shares of its capital stock, issued not to the two corporations but directly to their stockholders in proportion to their holdings in these corporations, it was held the transaction was subject to a stamp tax under Section 800, not only on the original issue of the shares, but also on the transfers necessarily involved, whereby the rights to receive the shares, inherent in the two corporations by operation of law, were transferred by agreement to the stockholders. The court said—"Its [the stock transfer tax] language disclosed the general purpose to tax every transaction whereby the right to be or become a shareholder of a corporation or to receive any certificate of any interest in its property is surrendered by one and vested in another. * * * While the statute speaks of transfers, it does not require that the transfer shall be directly from the hand of the transferor to that of the transferee. It is enough if the right or interest transferred is, by any form of procedure, relinquished by one and vested in another. * * * In the present case the generating source of the right to receive the newly issued shares of petitioner was the conveyance to it of the property of each of the corporations to be consolidated. The new shares could not lawfully be issued to any other than the grantor corporation without its authority, and that authority could not be exercised for the benefit of third persons other than its own dissenting stockholders. The consolidation agreement thus imposed ·he duty on petitioner to issue the new shares upon receipt of the property, and at the same time made disposition to the stockholders of the two corporations of the correlative right to receive the stock." Pages 62, 63 of 296 U.S., page 64 of 56 S.Ct., 80 L.Ed. 44, 102 A.L.R. 111.

Counsel for defendant seek to distinguish the Raybestos case from the case at bar, but it does not appear that the facts are sufficiently different to make inapplicable ·the principles expressed in that case. Defendant urges that the transaction in question was immune from tax under Article 35(d) of Regulations 71 as in effect in 1937 providing that "the surrender of the stock of the consolidating corporation in exchange for stock in the consolidated corporation, in case of consolidation of two or more consolidations" is not a transaction subject to tax. However, there is nothing in the present transaction to indicate that the new stock of the consolidated corporation was issued for the surrender of the Oswego stock. It was issued for the new assets which Northern had acquired from Oswego.

The defendant contends that upon the filing of the Certificate of Consolidation, Oswego ceased to exist, Sections 86 and 89 New York Stock Corporation Law, that it could not therefore "transfer" to Niagara Hudson any "right" of Oswego to receive stock of Northern; also that Section 89 of the New York Stock Corporation Law operated of itself to vest the former property of Oswego in Northern, or in other words—that the transfer was effected "wholly by operation of law" and as such is exempt by virtue of Treasury Regulations 71, Article 35(r). However, a similar contention that the transfer of the property of a constituent corporation to the continuing corporation was wholly by operation of law rejected in Niagara Hudson Power Corporation v. Hoey, Collector, etc., 2 Cir., 117 F.2d 414, certiorari denied 313 U.S. 571, 61 S.Ct. 958, 85 L. Ed. 1529; see also Weil et al. v. United States, 2 Cir., 115 F.2d 999; Koppers Coal & Transportation Co. v. United States, 3 Cir., 107 F.2d 706; Emporium Capwell Co. v. Anglim, D.C., 48 F.Supp. 292.

The transfer by Oswego to Niagara Hudson of the right to receive the 37,500 shares of Northern stock is a transfer requiring a tax under Schedule A(3) of the Revenue Act of 1926 as amended in 1932. Raybestos-Manhattan, Inc., v. United States, supra. See also Standard Oil Company of California v. United States, 9 Cir., 90 F.2d 571, certiorari denied 302 U.S. 741, 58 S.Ct. 143, 82 L.Ed. 573; United States v. Vortex Cup Cc. 7 Cir., 84 F.2d 925; American Gas Machine Co., Inc., v. Willcuts et al., 8 Cir., 87 F.2d 924.

In respect to the stamp tax claimed to be due on the transfer of realty from Oswego to Northern: The Revenue Act

of 1926, Schedule A(8), as added by Act June 6, 1932, § 725, 26 U.S.C.A. Int.Rev. Acts, page 297, requires that a stamp tax be paid on any "Deed, instrument, or writing * * * whereby any lands, tenements, or other realty sold shall be granted, assigned, transferred, or otherwise conveyed to, or vested in, the purchaser * * *", when the consideration or value of the property conveyed exceeds $100.

With the filing of the Certificate of Consolidation on December 1, 1937 realty valued at $3,415,337.39, formerly owned by Oswego, passed to the ownership of Northern. The tax on this, if a tax was due, amounts to $3,415.50. This presents the question as to whether a transfer of realty under such a merger is a conveyance of "realty sold".

That there was a transfer of real estate from Oswego to Northern is plain. Upon the filing of the Certificate of Consolidation the title to real estate, formerly vested in Oswego, became vested in Northern. In Niagara Hudson Power Corporation v. Hoey, supra, it was held that there was a transfer within the meaning of Section 800, Schedule A(3) where shares of stock in other corporations formerly held by a constituent corporation became vested in the continuing corporation upon consolidation. It was contended by the plaintiff in that case that "a transfer is inconceivable, for there was no instrument of transfer, nor was there any moment of time at which a transferor and a transferee were co-existent." In response to that contention Judge Clark, speaking for the Circuit Court of Appeals, said— "* * * In legal jargon a change of ownership, terminating rights and other relations in one entity and creating them in another, is the essence of 'transfer,' * * *". Page 416 of 117 F.2d.

■ Whether a transfer of realty should be taxable as well as a transfer of property consisting of securities is not for the court to say. However, a mere transfer or change of legal title is not a taxable transaction under Schedule A–8 which, as it now stands, expressly confines taxable transfers to "realty sold".

In the transaction now under consideration the elements characteristic of a "sale" are lacking; there is no agreement to sell; there is no deed containing the description of the realty. The usual bargaining leading up to and culminating in a sale and fixing the value of the property are absent. The change of title results from the filing of the Certificate of Consolidation; it was a form of transfer, but not a sale.

■ In Cortland Specialty Co. v. Commissioner of Internal Revenue, 2 Cir., 60 F.2d 937, it is said—"Reorganization, merger, and consolidation are words indicating corporate readjustments of existing interests. They all differ fundamentally from a sale where the vendor corporation parts with its interest for cash and receives nothing more." Page 939.

■ In New York Central R. Co. v. Commissioner of Internal Revenue, 2 Cir., 79 F.2d 247, certiorari denied Helvering v. New York Central R. Co., 296 U.S. 653, 56 S.Ct. 370, 80 L.Ed. 465, the court said —"The consolidated corporation does not succeed to the rights and liabilities * * * as a purchaser but as a successor by operation of law." Page 249 of 79 F.2d.

If, therefore, Northern acquired title to the realty otherwise than as a purchaser, it is evident that this change of title did involve a sale, for there can be no sale unless there is a purchaser.

■ In my opinion there is no conveyance of "realty sold" taxable under Schedule A(8) where a change of title to real estate is effected solely as a result of the filing of a Certificate of Consolidation under the New York Stock law. Section 89 supra. See Rochelle Investment Corporation v. Fontenot, D.C., 34 F.Supp. 118; Socony-Vacuum Oil Co. v. Sheehan, D.C., 50 F.Supp. 1010.

■ Niagara Hudson is a party liable for the tax incurred on the transfer of the rights to receive the new 37,500 shares of Northern. It was the transferee, and Section 800 of the Revenue Act of 1926 imposes liability for the tax upon transferor, the transferee, and the corporation whose stock is transferred. Raybestos-Manhattan, Inc., v. United States, 296 U.S. 60, 56 S.Ct. 63, 80 L.Ed. 44, 102 A.L.R. 111, supra; In re Consolidated Automatic Merchandising Corporation, 2 Cir., 90 F.2d 598; United States v. Revere Copper & Brass, Inc., 2 Cir., 100 F.2d 391.

Accordingly, the plaintiff may have judgment against the defendant, Niagara Hudson Power Corporation, for $1,500, with interest and costs.

Plaintiff may submit upon ten days' notice proposed findings of fact and conclusions of law in accordance with the above.