**WEST SHORE FUEL, INC., Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Ruth A. KOLB, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Nos. Civ–71–419, Civ–74–394.**

United States District Court, W. D. New York.

Jan. 12, 1978.

David L. Sweet, Heffernan, Sweet & Murphy, Buffalo, N. Y., for plaintiffs.

Richard J. Arcara, U. S. Atty., Buffalo, N. Y., for defendant (Donald T. Fish, Dept. of Justice, Washington, D. C., of counsel).

CURTIN, Chief Judge.

In both of these cases, the plaintiffs seek refunds of alleged overpayments of federal income taxes. The cases were consolidated for trial without a jury. The parties have filed stipulations of fact and numerous exhibits. At trial, only one witness was called to testify.

The facts in these cases are not in dispute. On March 1, 1967, a Plan of Merger and Liquidation was filed in accordance with the New York Business Corporation Law, under which American Steamship Corporation (American) was merged into Oswego Steamship Corporation, which continued the business under the name of American Steamship Company (hereinafter referred to as Oswego). Under the plan, shareholders of American were to surrender their shares in exchange for $585.00 in cash, $1,235.98 in three-year notes of Oswego, and $129.02 in ten-year notes of Oswego.

Plaintiff Ruth Kolb owned 2 shares of American before the merger. In exchange for her shares, she received $1,170.00 in cash and $2,730 in notes. Plaintiff West Shore Fuel, Inc. owned 160 shares of American before the merger and, as a result of the merger, received $93,600.00 in cash and $218,400.00 in notes. Both Kolb and West Shore Fuel filed timely elections to report the gain realized on the exchange on the installment method.

On January 10, 1968, the Internal Revenue Service (IRS) issued a technical advice memorandum concluding that the exchange of American stock for cash and notes of Oswego constituted a sale of stock rather than a reorganization under § 368(a)(1) of the Internal Revenue Code, and authorizing American stockholders to report their gain on the installment basis. On March 11, 1970, the IRS revoked this advice and decided that shareholders of American could not use the installment method of reporting their gain. Deficiencies were assessed against both plaintiffs. The plaintiffs paid the assessments and filed claims for refunds.

The plaintiffs claim that they are entitled to refunds for two reasons. First, they contend that they are eligible for installment reporting under the Internal Revenue Code because the payments received in the year of the sale did not exceed 30% of the selling price "exclusive of evidences of indebtedness of the purchaser." 26 U.S.C. § 453(b)(2)(A)(ii). Second, they argue that the IRS is estopped from modifying its earlier advice memorandum authorizing installment reporting.

Section 453 of the Internal Revenue Code provides that income from the sale or other disposition of personal property may be reported on the installment method if, in the year of the sale, "the payments (exclusive of evidences of indebtedness of the purchaser) do not exceed 30 percent of the selling price." 26 U.S.C. § 453(b)(2)(A)(ii). In this case, the cash payment of $585 per share was precisely 30% of the selling price of $1,950 per share. The Government, however, argues that the notes of Oswego received by the shareholders were not "obligations of the purchaser" within the meaning of § 453 and therefore must be considered part of the payment received in 1967, bringing the payment in the year of the sale above 30% of the purchase price. Rather than viewing the transaction as a sale of stock directly from the plaintiffs to Oswego, they characterize it as a sale of American's assets to Oswego, followed by a distribution of the proceeds of the sale to the American shareholders.

At the outset, it is instructive to note what is not involved in this case. Contrary to the plaintiffs' suggestions, we are not concerned with how the officers of American viewed the transaction or whether it could have been structured as a direct sale of stock to Oswego. Similarly, we are not interested in determining why the IRS decided to reconsider its first advice memorandum or whether the second memorandum was prompted by the characterization of the transaction in American's final tax return. The sole issue before the court is

whether Oswego was the "purchaser" of the plaintiffs' stock as the transaction was in fact executed. The question presented and its tax consequences were summarized by the IRS in its second memorandum:

> The real question to be resolved is whether, under the plan of merger and liquidation, the surrender of their shares by the stockholders of American was a sale of their stock to Oswego, or whether the transaction was actually a sale by American of its assets to Oswego, followed by the liquidation of American and distribution of the proceeds of the sale to the shareholders of American.

> If the transaction was a sale by the shareholders of American of their shares to Oswego, the shareholders could report the gain realized on the installment method of reporting as provided by Section 453(b) of the Internal Revenue Code of 1954. On the other hand, if the transaction was a sale of the assets by American to Oswego followed by the liquidation of American and distribution of the proceeds of the sale, including the notes of Oswego, to its shareholders, the shareholders could not elect the installment method of reporting the gain realized, inasmuch as the value of the notes would be treated as payment in the year of sale.

Although the plaintiffs vigorously assert that the transaction was a sale of stock directly from the American shareholders to Oswego, there is no basis for this assertion. American originally offered to sell its stock to Oswego, but Oswego rejected the offer and proposed a merger instead. The merger had none of the usual features of a sale of stock. Oswego did not make tender offers to individual shareholders, and individual shareholders could not elect whether to sell or to retain their stock but could only vote for or against the plan of merger and liquidation. Once two-thirds of the shareholders voted in favor of the plan, an individual shareholder only had a right to receive a liquidation distribution. After the

transaction was completed, Oswego did not hold shares of American but rather American no longer existed as a separate corporate entity and its business was taken over by Oswego.

The plan of merger and liquidation, rather than being a sale of stock, more closely resembled a sale of assets coupled with a liquidation, as a result of which Oswego became the sole owner and manager of American's business, American was dissolved, and American's shareholders exchanged their shares for liquidation proceeds. The plaintiffs' only remaining argument is that the shareholders rather than the corporation sold the assets to Oswego. If American distributed its assets in kind to its shareholders, who then conveyed them to Oswego, Oswego's notes would qualify as evidence of indebtedness of the purchaser under § 453 and the shareholders could report their gain on the installment basis. On the other hand, if American sold the assets and then distributed Oswego's notes to the shareholders in liquidation, Oswego's notes would not qualify as evidences of indebtedness of the purchaser. *Freeman v. Commissioner of Internal Revenue*, 303 F.2d 580 (8th Cir. 1962).

The Supreme Court has established some guidelines for determining whether the corporation or its shareholders transacted a sale of assets in connection with liquidation of a corporation.[1] In *Commissioner of Internal Revenue v. Court Holding Co.*, 324 U.S. 331, 65 S.Ct. 707, 89 L.Ed. 981 (1945), the question presented was whether the corporation was taxable on the gain realized by a sale of its assets. The corporation reached an oral agreement with the prospective purchasers for the sale of its only asset, an apartment building. It then transferred title to the building to its shareholders, who in turn surrendered their outstanding stock. A sale contract was executed between the shareholders and the purchasers, and title was conveyed. The

---

1. The question raised in this case does not normally arise because the shareholders of the acquired corporation receive shares of the surviving corporation rather than cash, and as a result the transaction qualifies as a tax-free "corporate reorganization" under the Internal Revenue Code. 26 U.S.C. §§ 354(a), 368(a)(1)(A).

Supreme Court held that the transaction was in substance a taxable sale by the corporation rather than by the stockholders. It reasoned that the corporation in fact negotiated the sale and that therefore the gain should be attributable to the corporation rather than the shareholders.

In *United States v. Cumberland Public Service Co.*, 338 U.S. 451, 70 S.Ct. 280, 94 L.Ed. 251 (1950), the Court on different facts held that a sale of assets by the shareholders following a genuine liquidation of the corporation was not attributable to the corporation because the shareholders rather than the corporation had negotiated the transaction. The Court found that the identity of the seller was a question of fact for the trial court that could be resolved by considering the parties' motives, intent, and conduct as well as their written instruments. *Id.* at 454, n.3, 70 S.Ct. 280.

These cases arose under a former provision of the Internal Revenue Code taxing corporations which sold their assets but not taxing corporations which distributed their assets in kind to their shareholders as part of a liquidation. Today, there is no longer any difference in tax treatment between a sale by a corporation followed by distribution of the proceeds and a distribution in kind followed by immediate sale of the assets by the shareholders. 26 U.S.C. § 337. The strict holdings of these two cases are now obsolete. However, in the absence of any other authority, the principles established in *Court Holding* and in *Cumberland Public Service* are instructive in determining whether American or its shareholders sold the assets to Oswego.

On this record, it is clear that the corporation rather than its shareholders negotiated the sale to Oswego. Among the exhibits are several letters from the president of Oswego to American's Board of Directors discussing various terms of the proposed acquisition. Also included in the record are the minutes of numerous meetings of the Boards of Directors of both corporations discussing the terms of the sale. These exhibits reveal that in September, 1966, Oswego offered to acquire American's as-

sets on a cash basis. The executive committee of American's Board had no objection to the acquisition of its assets or the price, but did not want the stockholders to assume the burden of hidden or contingent liabilities, as proposed in Oswego's offer. American suggested instead that Oswego purchase its stock. However, Oswego was not interested in making tender offers and conducting individual negotiations with all 550 of American's shareholders, and was not willing to risk acquiring less than 100% of the shares. The plan of merger and liquidation ultimately agreed upon between the two Boards was designed to meet the objections of both corporations: the corporate shell of American was to be eliminated and Oswego was to acquire American's assets. At all times, these negotiations were conducted between the two Boards, with no input from American's shareholders.

Only after American's Board of Directors adopted the Plan of Merger and Consolidation were the American's shareholders asked to approve the plan. This occurred at a special meeting of American's shareholders held on December 27, 1966. Individual shareholders could not elect whether or not to sell but could only vote for or against the plan.

■ These facts make clear that the corporation rather than the shareholders negotiated the sale. Under the principles of *Court Holding*, American rather than its shareholders should be treated as the seller of American's assets, with the shareholders receiving their distributions upon liquidation of American after the sale. Accordingly, Oswego was not the purchaser of the plaintiffs' shares, and the plaintiffs are not entitled to report their gain on the installment basis.

Several cases cited by the Government involving a former federal tax on stock transfers provide further support for its position. Although these cases are not directly in point, the Government argues that they apply by analogy to the question at issue here. In *United States Industrial Chemicals, Inc. v. Johnson*, 181 F.2d 413 (2d Cir. 1950), the plaintiff corporation and its

subsidiary merged, with the subsidiary surviving. Under the merger plan, the plaintiff's shareholders were authorized to exchange their stock certificates in the parent for shares in the new corporation. When the Government imposed a transfer tax on the corporation based on the number of shares exchanged for new certificates, the plaintiff protested, arguing that it had not transferred the new certificates to the shareholders and that it therefore was not liable for the transfer tax. The court held that the plaintiff acquired the right to receive the stock in the surviving corporation when it conveyed its assets to the subsidiary pursuant to the merger, and that it then transferred this right to its shareholders as a necessary part of the merger transaction. Accordingly, the transfer tax was upheld.

In reaching its conclusion, the court relied on *Raybestos-Manhattan, Inc. v. United States*, 296 U.S. 60, 56 S.Ct. 63, 80 L.Ed. 44 (1935). In that case, two independent corporations transferred their assets to a third, which issued its stock directly to the shareholders of the former. The Supreme Court found that a taxable transfer of the stock had taken place from the consolidated corporations to their shareholders. It reasoned that a transfer by the consolidated corporations of their right to receive the surviving corporation's stock was a necessary part of the consolidation transaction. *See, also, American Processing and Sales Co. v. Campbell*, 164 F.2d 918 (7th Cir. 1947), *cert. denied*, 333 U.S. 844, 68 S.Ct. 661, 92 L.Ed. 1127 (1948).

These cases support the finding that Oswego's notes were transferred to the plaintiffs by American. Even though the shareholders received their notes and cash from Marine Midland rather than from American, following a statutory merger there is deemed as a matter of law to be a transfer from the merged corporation to its shareholders.

The plaintiffs cite two cases in support of their position: *Frizzelle Farms, Inc. v. Commissioner of Internal Revenue*, 61 T.C. 737 (1974), and *Securities and Exchange Com-*

*mission v. National Securities, Inc.*, 393 U.S. 453, 89 S.Ct. 564, 21 L.Ed.2d 668 (1969). Neither of these cases is controlling. In *Frizzelle Farms*, the parties stipulated to the treatment of the merger as a sale of stock by the stockholders to the new corporation, and therefore the court never addressed the question at issue in this case. The sole issue before the court was the value of the stock warrant received by the shareholders of the acquired corporation in exchange for their shares. *Securities and Exchange Commission v. National Securities, Inc.* involved the applicability of § 10(b) of the Securities Exchange Act of 1934 to an exchange of the stockholders' share in the old corporation for shares in the new corporation pursuant to a corporate merger. The Supreme Court held that the transaction constituted a sale of securities within the meaning of the Act's antifraud provisions. The Court's decision, however, was based on the Act's policy against deceptive or fraudulent practices, and has no bearing on the question of using an installment method for reporting gains.

The plaintiffs' second argument is that the IRS is estopped by its advice memorandum of January, 1968, from reversing its decision to allow shareholders to report on the installment basis. This argument is unconvincing. The IRS has full authority to revoke or modify a ruling "at any time in the wise administration of the taxing statutes" or when the ruling is "in error or not in accord with the current views of the Service." 26 C.F.R. §§ 601.201(1)(1), (1)(4). Retroactive application of a revoked or modified ruling is precluded only where, *inter alia*, the ruling was originally issued with respect to a prospective or proposed transaction. *Id.* § 601.201(1)(5).

Even apart from the IRS regulations, there is no basis for invoking the estoppel doctrine in this case. The memorandum of January, 1968 merely set forth the IRS's conclusion as to the application of the tax provisions to the transaction. Its second memorandum was not based on new facts but corrected what the Service perceived to be an error of law. Under these circum-

stances, the estoppel doctrine does not apply. *Commissioner of Internal Revenue v. Union Pacific Railway Co.*, 86 F.2d 637, 639–40 (2d Cir. 1936). Moreover, the plaintiffs have not established that they relied on the ruling in structuring the transaction. To the contrary, the memorandum was issued after the merger had taken effect and the transaction had closed.

The Clerk shall enter judgment in defendant's favor without costs.

So ordered.